*Avery, J.
The court of common pleas erred, it is said, in refusing to charge the jury, as required, upon the defendants’ right of possession, and erred also in rejecting the deed from the executors of Aaron Olmsted to David Abbott, and the other subsequent deeds in the chain of title. These points have been examined at some length by the counsel, but we are not satisfied that in either case there was any error. We come, therefore, to consider the third alleged error, which has been amply discussed* and treated, we think, with reason, as presenting the important question in this case to be decided. This third error assigned is, the exclusion of the act of the legislature offered in evidence by the defendants. The act alluded to was passed as early as in the year 1813, January 7th, and the preamble recites substantially as follows: That whereas, Aaron Olmsted, late of Hartford, Connecticut, by his will devised to his three sons, Horace B., Aaron F., and Charles H. Olmsted, all his estate in the Connecticut Western Reserve, in Ohio, containing about 30,000 acres, to be to them (his said three sons) in equal shares, and to the heirs of their bodies lawfully begotten forever; and whereas said lands are unimproved and unproductive, and by reason of the entailment unsalable, whereby the aforesaid devisees are unable to derive any benefit' therefrom, or any means of paying the taxes thereon, which are yearly accumulating, with penalties aud interest, which must in a short period totally divest the said devisees of their interest in said lands, which to prevent, and to render said property useful to said devisees and their posterity. After reciting as aforesaid in the preamble, the act went on to provide that a committee should make partition of the lands among the three devisees; that they should be governed by the provisions of the general act to provide for the partition of real estate, and should make return of such partition to the Supreme Court for the counties within which the lands were situated. Three trustees were appointed by the act, to wit: Ma^r L. Olmsted, Levi Goodwin, and Caleb Goodwin; one, to wit, Mary L. Olm.sted, said to be the ^mother of the devisees, and the executrix named in the will, and another of the three, Caleb Goodwin, executor also of the will. The trustees were required to give bond to the acceptance of the Supreme Court, in double the value of the lands, conditioned for the faithful performance of the trust. They were authorized to sell and convey all or any part *216 of the lands, and to apply the first proceeds to the payment of taxes and the removing of incumbrances; and the principal sum, after making the disbursements aforesaid, to be vested in property or funds, that should be deemed secure and most beneficial to the devisees, the interest or profit to be applied, from time to time, to the use of the devisees. There is this provision, also, among others: that in case of the death of either of the devisees, his share of said estate, whether in the lands or other property derived from the sale of them, should descend to the legal representatives in the same manner as other similar property; and the trust estate and entailmont, so far as regarded the share of the deceased devisee, should cease, and the estate become absolute in such representatives; except if such deceased devisee should leave •a widow, her dower estate should continue during her life. The introduction of the act in evidence was to have been followed by proof, such, we understand, as the following: that the trustees sold the land, to wit, the 30,000 acres, and executed conveyances to the purchasers; that the act was procured by persons acting for the devisees; that the devisees had issue born before conveyance executed by the trustees; that the title through the trustees •came down to the defendants by deed; and that for a long period of time none of the devisees or their representatives pretended to .assort any title to these lands; and that the proceeds of the sale were paid out according to the provisions of the act, and the pro•cecdings under it were acquiesced in by all the parties who were capable of acquiescing. But a statement of the intention to offer further evidence in connection with the act does not appear upon the record; and the omission to make this offer of further proof, and to cause it to be noted *in the bill of exceptions, should, as it is now urged, preclude the defendants in ejectment from claiming that they had such proof.
Upon the trial of a cause, it is not essential that the facts to be proved should be introduced in any given order, though the party, 'before the close of his case, must be prepared to show each link in the chain of his evidence. Nor is it customary, before offering the proof of a fact, to state what further facts will be proved j such statement not being often of any use for the purposes of the trial. But if the cause is to be taken up by writ of error, and the judgment of the court questioned for rejecting evidence, then it may be desirable to know the state of facts connected with the *217 evidence offered. A statement of the offer of further proof above spoken of, is usual and proper in the bill of exceptions; but there is no rule or settled practice making it indispensable. There is nothing in the case to show that the omission was not accidental, nor ground to suppose that any defect of evidence was concealed. The objection, therefore, which has been taken and urged, is not sustained.
The important question in the case, and whieh we are now called to decide, is, whether the act, with the evidence in connection with it, will support the title of the defendants in ejectment. And here, in behalf of the children of the devisees, the ground is taken, that the act is unconstitutional and therefore void; that it is a special act, attempting to take the property of one person, and without or against his consent, to give it to another. This makes it proper to inquire, what kind of estate was to be operated upon by this act. It is described in the will of Aaron Olmsted, as devised to his three sons in equal shares, and to the heirs of their bodies lawfully begotten forever. The law must determine what estate the devisor meant to convey, and what power over it belongs to the devisee. We may go back to the early periods of the English common law, and in the search among its ancient records we shall discover that words such as are employed in this will meant in England, first, *a conditional fee, and afterward, by the operation of statute de donis, a fee tail.
By the law, under the first description of estate, if the grantee had issue, the estate became absolute in him, so that, by his conveyance, he could bar both his own issue and the reversioner; and, even before issue, the grantee could have barred his issue. But in England a restraint was imposed upon this power of alienation by the above-mentioned statute, and the result was, that this conditional fee became a fee-tail. Such a fettering of estates created great uneasiness and dissatisfaction, but the struggles to obtain relief beiore the parliament, were without any success. Afterward, while the evil was pressing with great severity upon the body of the English subjects, and parliament, to whom the duty properly belonged, refused to interpose and pass the necessary laws, that relief, in another form, was obtained from this great national grievance. It was secured by what has been characterized as a bold and unexampled stretch of the power of judicial legislation. The English judges, upon consultation, resolved that *218 an estate tail might be barred by a common recovery; and these recoveries have been since considered simply a conveyance on record, invented for the express purpose of giving the tenant in tail an absolute power to dispose of his estate.
The tenant holding a conditional fee could, by the common law, pass a title to the estate. By an act of parliament, the statute de donis, the owner was deprived of his ancient power of alienation ; and, by this act, it is said, the true policy and rule of the common law was overthrown. But this resolve of the judges before mentioned, in effect, at once removed burdensome restraints which had been imposed upon alienations, by the express provisions of a statute, and furnished a memorable instance of an act of the English judges, which could resist and overturn the power, sometimes irreverently called omnipotent, of an English act of parliament. This interposition of the courts of law took place as early as in the reign of Edward IY. Afterward ^restraints were in various ways further removed ; and estates tail in England have long been reduced to almost the same state even before issue born, as conditional fees were at common law after the birth of issue. 4 Kent’s Cora. 12, 13, etc. In which case, as has been before stated, the grantee can pass a perfect title, barring both his own children and the reversioner.
It is asked, in the present case, whether an estate tail could ever have existed in Ohio, and whether any such estate was recognized when the will of Aaron Olmsted took effect, on September 9, 1806. We have had some legislation in this state, by which, in terms, the English common law, and statutes made in aid of the common law, wore introduced into this state. The last act upon the subject repealed the law which had expressly adopted the common law, and certain statutes made in aid thereof, which were not mentioned by name. The repealing act was passed in January, 1806. What was the effect of this legislation, first adopting the common law in a body, and then repealing the law which had so adopted it? It has not been to exclude the common law. That has always been in force, and it could not have been excluded without producing effects marked in character like those which follow in the train of a revolution. If that could have been actually excluded, we must, from necessity, have been driven to adopt at once the civil law, or some other code, to furnish a system of rules needed to act upon the countless and complicated *219 interests of such a community as ours. No one can suppose, however, that there was ever a time when the common law of England was not in force here. It was indispensable to the action of our courts at all times. But with us, as in the other states of this Union, parts of the common law, not applicable to our circumstances, or not suited to the genius of our institutions, were not introduced, and formed no part of our law. To our courts the power seemed, in many cases, necessary—and then they always exercised it—of deciding what portions of that law were not applicable. Applying *our principles to this law of entails, should we be likely to give force to the statute de donis?—to adopt its restraints upon alienation, imposed for the sole benefit of a great landed interest, and in opposition to the liberal policy of the common law—burdening industry, and embarrassing the business of the country ? Or, following the course of the English judges, without the stretch of power, should we reject it as inapplicable? If. any restraints were left in this estate, beyond what belonged to it by the common law, they would not probably be adopted.
Upon one of the English laws, the statute of uses, which was deemed objectionable, this court passed in the case of Helfenstine’s Lessee, 7 Ohio, 276. Of this law, they there say, if ever in force, it became so by the statute of 1795 or 1805, and was-repealed by that of 1806.
It will be discovered, by this view of the case, that the title of issue, even if an estate tail be created by the words of the will, would not probably have been deemed a serious obstacle in the way of any conveyance, when such conveyance was believed to be demanded by circumstances. But upon the supposition that rights were actually created by the will, which would become vested rights in th e issue of the devisees, upon the birth of such issue, then it is to be determined in that aspect of the case, whether the act in question, or so much as authorized a sale of the premises, is valid.
The legislature undertook to provide, by a private act, that certain trustees named in the act should have power to pass the title to this estate. Had they the power ? It can not be claimed that in England, from which mainly we derive the principles governing in our system of jurisprudence, innumerable private acts of parliament have been passed; and from a remote period down to *220 the present time, the courts of that country have given to such acts their sanction. Amongst these acts will be found such as pass the titles of estates ; convert estates tail into estates in foe, authorize sale of lands held by tenant for life with remainder in fee *to such as have no power to convey ; such also as confirm partitions by which infants or remainder-men will be barred. A private act is there said to be as powerful and effective, if duly obtained, as a public one, in transferring the legal estate in lands from one person to another, and in binding all who are intended to be bound by it. 5 Cruise’s Dig. 9. Private acts passing the title to lands, and in various ways operating upon individuals, have not been unfrequent in many of the states of the union. In our own state, since its organization, private acts have been for a long time, and often, passed, authorizing the settlement of estates, appointing trustees, and giving directions to make conveyance of land in fee. Under laws of this kind large bodies of land, in various parts of the state, have been conveyed; and if titles so acquired shall prove not to be valid, an evil of no common magnitude will be the consequence. As private acts, authorizing the sale and transfer of lands, have been passed by the practice of the legislature for many years, and extensive interests have been acquired upon the faith of these legislative acts, a court would with reluctance declare such acts void when fairly obtained. Uoneral laws for the sale of land, in behalf of minors and others who are and should be themselves incapable of conveying, are found constantly upon our statute books; and no evil is discovered to arise from this source, or none sufficient to cause their repeal. The special law under consideration was passed between thirty and forty years ago. It recited, in its preamble, just motives and reasons for its passage. It may be, when proof is taken, that none of its statements can be contradicted, and no evidence be given to show that any but fair means were employed to procure its passage; that the friends of the devisees petitioned for it. This act- provided, indeed, for converting real estate into personal, but it took care to secure fidelity in the agents appointed to make the sale; and in this case, as in many others of a similar kind, a conformity to the general law where practicable was directed. Ample bonds were required, and the proceedings of the ^trustees were from time to time to be brought before the Supreme Court. By the act, the trustees were empowered to sell *221 and convey, or to lease the land. They were to vest the proceeds, after certain disbursements, in property deemed secure and most beneficial for the said devisees. They did sell and make deeds of conveyance, we are to suppose; and the title which they passed went to purchasers, it is claimed, with whom was connected an occupancy of nearly forty years. In addition to this, it is asserted that the devisees received the proceeds of the sale, and acquiesced for years in all the proceedings of the trustees.
Upon legal principles, as applied to this case, we think the defendants in ejectment had a right to give the special act in evidence, and that the common pleas erred in rejecting it.
Judgment reversed.
Hitchcock, J., having been one of the counsel in the case, did not sit on the trial.